# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEERLESS NETWORK, INC., | |
| Plaintiff, | Case No. _____ |
| v. | |
| LTE WIRELESS, INC. | **COMPLAINT AND DEMAND** |
| Defendant. | **FOR JURY TRIAL** |

Plaintiff Peerless Network, Inc. ("Peerless"), by and through its undersigned counsel, states as follows for its Complaint against defendant LTE Wireless, Inc. ("LTE" or "Defendant").

## I.  INTRODUCTION

1.      LTE is a competitive local exchange carrier ("CLEC")[1] which purports to offer and provide local exchange services through its end office switches in New York, Iowa, South Dakota and Oregon.  LTE has also obtained telephone numbers from the North American Numbering Plan Administrator ("NANPA") for use and assignment to its end user customers. Telephone calls from the PSTN destined to LTE customers are routed through interconnecting carriers like Peerless that provide tandem switching services. Upon information and belief, LTE has also used other interconnecting carriers for tandem switching services, including LCR Hub and Impact.

2.      This action arises from LTE's activities that were intended to collect from Peerless unjust, unreasonable, and unlawful intercarrier compensation through an unlawful traffic pumping or "access stimulation" scheme in violation of the Federal Communications

---

[1] A Local Exchange Carrier ("LEC") provides local exchange services. CLECs are a subset of LECs that began providing services after 1996.

Commission's ("FCC") *Access Arbitrage Order*,[2] its rules, and the Federal Communications Act ("Act"). This scheme, conducted in cooperation with third-parties, used a physical interconnection arrangement between Peerless and LTE to route massive volumes of unlawful traffic from the public switched telecommunications network ("PSTN") to LTE, resulting in over a million dollars of fees paid to LTE and lost revenue on services provided to other carriers, and avoiding LTE's legal obligations under the Act to pay Peerless for those calls.

3.      LTE's arbitrage scheme involves the termination of tens of millions of calls over the course of several months to tens of thousands of its assigned telephone numbers assigned to one or more customers, for the sole and exclusive purpose of collecting switching service fees from other carriers, and using those payments to either share revenue with its end user customers, or otherwise subsidize free services provided to LTE's customers in a manner that is prohibited by 47 C.F.R. § 61.3(bbb), and is unjust and unreasonable in violation of Section 201(b) of the Act.

## II.   PARTIES

4.      Peerless Network, Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business at 410 W. Van Buren St., Suite 410S, Chicago, Illinois 60607. Peerless provides a variety of telecommunications services, including, *inter alia*, interstate exchange access service, intrastate exchange access services, long distance, Signaling System No. 7 ("SS7"), transit, and enhanced services on a wholesale and retail basis.

5.      LTE is a South Dakota corporation, with offices purportedly at 3916 N Potsdam Ave, Sioux Falls SD 57104, Suite 1061. LTE is a common carrier and purports to provide

---

[2] *See* Report and Order and Modification of Section 214 Authorizations, *Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage*, 34 FCC Rcd 9035 (September 27, 2019) ("*Access Arbitrage Order*").

telecommunications services in Montana, New York, Oregon, South Dakota, Utah, Vermont and Washington. Upon information and belief, LTE has been certified or authorized as a competitive local exchange carrier in Iowa, New York, Oregon and South Dakota.

6.     LTE conducts business within, and directed to, the State of New York under the name LTE Wireless - NY.  In May 2019, LTE applied to the New York Department of Public Service (NY DPS) for a "Certificate of Public Convenience and Necessity (CPCN) to operate in New York State as a facilities-based provider and reseller of telephone service, with authority to provide local exchange service."[3]

7.     Millions of telephone calls originated from and/or were destined to LTE telephone numbers associated with New York LATAs, including LATA 142 in Manhattan. Upon information and belief, based on information provided by LTE, LTE operated equipment used for the exchange of the telephone calls that are the subject of this litigation at 25 Broadway, New York, New York.

8.     Despite its name, LTE Wireless does not hold any licenses or authority to provide wireless services.

9.     LTE purports to offer unlimited wireless talk, text and video calling on the LTE Network for $10 per month, and "Traditional Land-Line" business or residential phone service for $19.99 per month or less.[4]

III.     RELEVANT NON-PARTIES

---

[3] *See* May 15, 2019 Letter from New York Department of Public Service to LTE Wireless, *Re: Matter No. 19-00461 - Petition of LTE Wireless Inc. d/b/a LTE Wireless – NY for an Original Certificate of Public Convenience and Necessity.*

[4] https://ltewireless.com/index.php

10.    In addition to the above-named parties, the following non-parties are involved in the facts underlying this Complaint.

11.    Shavkat Ilya is purported to be the Chief Executive Officer and principle shareholder of LTE. Upon information and belief, Mr. Ilya resides at 621 Avenue Z, Brooklyn, New York.

12.    LCR Hub, Inc. is a South Dakota Business Corporation with its address at 25 First Avenue SW, Ste A, Watertown, South Dakota 57201. As alleged below, LCR Hub is identified in the Local Exchange Routing Guide ("LERG") as the default access homing tandem provider for calls destined to LTE telephone numbers and end user customers.

13.    TelxMedia, Inc., is a New York business corporation with its address as 244 5th Avenue, Suite W221, New York, New York 10001. TelexMedia ported telephone numbers to LTE to be used in the actions that give rise to this Complaint.

14.    Kappa Premium Telecom, is, upon information and belief, an India-based company that sells "premium rate numbers" from around the globe. In 2020, Kappa Premium advertised LTE telephone numbers on its Facebook page, highlighting that calls to these numbers would earn an operator money.

## IV.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This case arises under federal statutory and common law and relates to rights and obligations created pursuant to federal statutes, specifically 47 U.S.C. §§ 201 and 203.  Further, 47 U.S.C. § 207

provides that "[a]ny person claiming to be damaged by any common carrier . . . may either make complaint to the [FCC] . . . [or] in any district court of the United States . . . ."[5]

16.     This Court has personal jurisdiction over LTE under N.Y. CPLR § 301. Upon information and belief, LTE's headquarters is located in the State of New York. LTE, therefore, is continuously present in New York and subject to personal jurisdiction in New York for all purposes.

17.     In the alternative, personal jurisdiction over LTE is appropriate under N.Y. CPLR §§ 302(a)(1) and (a)(2). LTE regularly transacts business within the State of New York. In addition to the business conduct alleged in paragraphs 6–7, *supra*, on or about March 19, 2020, Peerless and LTE entered into an agreement which provides that it will be "governed by and construed in accordance with the Laws of the State of New York without regard to conflicts of law principles." Moreover, as alleged more fully below, LTE has engaged in a course of tortious conduct, some of which took place in New York, including in this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because LTE conducts or has conducted continuous, systematic and routine business in the state of New York, the Defendant resides in this District due to its contacts with this District, and the transactions in question occurred in part in this District.

---

[5] There is a pending arbitration between Peerless and LTE. Peerless asserted a counter-claim in the arbitration that was similar to the claims asserted in this action—*i.e.*, that LTE's conduct violates Section 201(b) and the FCC's access stimulation rules. The Arbitrator dismissed Peerless's counter-claim without prejudice, holding that Peerless's counter-claim was not subject to arbitration under the parties' Agreement. The Arbitrator's decision expressly held that Peerless was free to assert its claim against LTE outside of arbitration, and it does so here.

## V.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.  Overview of Long Distance Calls

19.     This case involves the exchange of telecommunications traffic involving hundreds of wireless and wireline telecommunications carriers delivering telephone calls through Peerless, and destined to LTE telephone numbers and end user customers. At a high level, carriers have different regulatory obligations and financial responsibilities depending on their placement in the routing of a call. For example, local exchange calls are those that originate (*i.e.*, begin with the calling party) and terminate (*i.e.*, end with the called party) in one delineated geographic area (typically called a "local exchange area"). Long distance calls are those that originate in one local exchange area and terminate in another local exchange area.

### 1.  Local Exchange Carriers and Inter-Exchange Carriers

20.     Local calling services, commonly called local exchange services, are provided by LECs (a subset of which are CLECs that began providing services after 1996). LECs operate local exchange networks in their designated service areas. There, they originate, transport, and terminate local telecommunications traffic. LECs are the companies that provide the telephone numbers to the customers, who use those numbers for their telecommunications needs.

21.     In addition to carrying purely local calls, because LECs have the physical direct connection to actual end users, LECs are also typically responsible for helping long-distance carriers originate and complete (terminate) calls that are coming from, or going to, the telephone numbers associated with the LEC's customers. In exchange for giving long-distance carriers this access to their local networks—also called "access service"—the LECs charge "access charges" to the long distance carriers. Typically, these access charges are filed tariffs.

22.     Long distance calling services, also called interexchange services, are provided by long distance carriers (also known as inter-exchange carriers or "IXCs"), and enable the origination and termination of long distance calls. Many carriers, such as AT&T or Verizon, can serve as both LECs and IXCs on different telephone calls.

23.     For example, assume that an end user in Los Angeles's 310 area code makes a long distance call to a friend in New York (212 area code) using his or her "pre-subscribed" IXC, AT&T. The Los Angeles caller will dial the New York number (*e.g.* 1-212-NXX-XXXX).

24.     The Los Angeles caller's LEC transports the call over its network to the point of presence ("POP") of the IXC, *e.g.* AT&T, that the calling customer has selected as his or her long distance provider. In this example, the caller's LEC must deliver the long distance call to AT&T. The POP is actually a physical point where the LEC hands off the call to the IXC, which then takes the call onto its network. A POP may house servers, routers, switches, and other equipment that receive instructions to send the call to New York.

25.     AT&T picks up the call and its associated data from the LEC that originated the call in Los Angeles, and transports the call (and the associated data) to its POP, near to the called party in New York. There, AT&T hands the call off to the receiving party's LEC, *e.g.* Verizon, which delivers the call to the receiving telephone number and called party.

26.     In this example, the LECs in Los Angeles and New York helped carry the call so they will bill AT&T "access charges" for the switching service and network facilities used to originate and terminate the call. The rates for these access charges, and other terms and conditions of the LECs' access services, are set forth in commercial agreements, federal tariffs filed with the FCC for interstate traffic, and in state tariffs filed with state public utility or service commissions for intrastate long distance calls.

## 2. Tandem/Access Service Providers

27.     The telecommunications network is complicated by the fact that each leg of the network typically has a fixed capacity. To ensure calls complete, secondary paths are selected when the primary call path is unavailable.

28.     In addition, in the example set forth in Section V.A.1. above, the IXC had direct connections to both the originating and terminating LECs. This is not always the case. In particular, nationwide IXCs do not have a direct connection with some LECs.

29.     If there is no direct connection with the terminating LEC (e.g. Verizon), the IXC will send the call to an intermediate switch called a "tandem switch" so the call can get to the terminating LEC and called party. The tandem switch may be owned by the terminating LEC or a third-party provider.

30.     A carrier that is attempting to terminate a call to a telephone number can identify the default terminating tandem (*i.e.* "homing tandem") provider or LEC in the Local Exchange Routing Guide ("LERG").

31.     In addition to the LERG, carriers have commercial agreements which are used to terminate calls to LECs. These commercial agreements are also known as "least cost routing" ("LCR") services. The financial terms among the various carriers that participate in the process to originate calls from a calling party, exchange the calls through the various switches and transport facilities to the terminating LEC, and the telephone numbers associated with the called party, are contained in either commercial agreements or tariffs.[6]

---

[6] *Access Arbitrage Order* ¶ 16 at 9042.

32.     The FCC has found that the access service rates that are contained in the LECs' tariffs create a "price umbrella," while the rates contained in the commercial agreements for terminating calls to LECs are generally lower than the tariffed rates.[7]

**B. Financial Liability for Terminating LECs That Engage in Access Stimulation Schemes.**

33.     In an "access stimulation" scheme, a terminating LEC partners with end user customers that offer high volume "free" calling services, such as "free" international calls, and/or "free" streaming radio.[8] The services can be free to the users, but the costs of these services are subsidized by other carriers that pay for the transport and termination of the interexchange calls.[9] That is because the massive volumes of calls generate access charges paid by IXCs to the terminating LEC, which traditionally shared the revenues with its end user partners.[10]

34.     In 2011, the FCC found that "access stimulation imposes undue costs on consumers, inefficiently diverting capital away from more productive uses such as broadband deployment," and that it "harms competition by giving companies that offer a 'free' calling service a competitive advantage over companies that charge their customers for the service."[11]. (quotation omitted). Through 47 CFR § 61.3(bbb)(1), the FCC "established parameters to define

---

[7] *Id.* at 9035.

[8] *In re Matter of AT&T Corp., et al. v. Wide Voice, LLC*, 36 F.C.C. Rcd. 9771, 9773 (2021) ("*Wide Voice Order*"); *see also Access Arbitrage Order* at ¶ 1.

[9] *Access Arbitrage Order at* ¶¶ 20, 25.

[10] *See, e.g., Sprint Commc'ns v. Crow Creek*, 200 F. Supp. 3d 857, 869 (D.S.D. 2016) (an access-stimulation LEC paid Free Conferencing up to 95% of its gross access charge revenue).

[11] Report and Order and Further Notice of Proposed Rulemaking, *Connect America Fund*, 26 FCC Rcd 17663, at ¶¶ 663, 665, 657 (2011) ("*Transformation Order*") ("the combination of significant increases in switched access traffic with unchanged access rates . . . results in inflated profits").

when a LEC is engaged in access stimulation and imposed a specific 'benchmark rule' on the rates for services provided by those access-stimulating LECs."[12]

35.     The FCC and courts concluded, "hundreds of millions of Americans pay[] more on their wireless and long distance bills" because the costs of the "free" calls are passed on via these "hidden, inefficient charges."[13] In the D.C. Circuit's words, access stimulation schemes are "a 'win-win' for the local carrier and its phone call-generating partner," but "the losing end" consists of "the public and the interexchange carriers" that foot the bill for "artificially inflated and distorted access charges."[14]

36.     The FCC has also found that access stimulation schemes "result in call blocking and dropped calls.[15] Dropped calls are particularly problematic when access stimulators quickly move large volumes of traffic, many times above the "normal call volume."[16]

37.     To reduce the incentive to participate in access stimulation schemes, in 2019, the FCC revised its rules requiring those LECs that engage in access stimulation "to bear financial responsibility for all interstate and intrastate tandem switching and transport charges for terminating traffic to [their] own end office(s) or functional equivalent whether terminated directly or indirectly."[17] Access-stimulating LECs are required to pay for services provided by intermediate carriers that they introduce into the call path. The FCC explained that the new rules

---

[12] *Wide Voice Order* at 9773–74.

[13] *Transformation Order* at ¶ 9.

[14] *All Am. Tel. Co. v. FCC*, 867 F.3d 81, 85 (D.C. Cir. 2017) (internal quotations omitted).

[15] *Access Arbitrage Order* at ¶ 3.

[16] *Id.*

[17] *Id.* ¶ 17.

"properly align financial incentives by making the access-stimulating [LEC] responsible for paying for the part of the call path that it dictates."[18]

38.     In issuing its new rules, the FCC reaffirmed that transport and termination payments made to access stimulating LECs — whether via tariffs filed by LECs or via commercial agreements with wholesale service providers — were a form of implicit subsidies that were being used to force other carriers and their customers to pay the costs of free or low-cost high-volume calling services.[19] The new rules sought to end these implicit subsidies by making the access-stimulation LECs responsible for transporting and terminating the calls that they and/or their partners stimulate.[20]

39.     Because LTE and other entities engaged in access stimulation can no longer use tariffs to force payment of tariffed rates for tandem switching and transport charges, long distance carriers have little reason to use commercial routes offered by wholesale service providers, at least unless the price is below the IXC's costs of carrying the traffic.

40.     However, access stimulating LECs have been found to create call congestion and call blocking scenarios, and then make threats to other interconnecting carriers that they will file complaints or petitions with the FCC alleging that those other carriers are not properly routing calls through the carriers which do have interconnection under commercial agreements. These threats are intended leverage IXCs and terminating carriers to either increase the capacity of their interconnections with the access stimulating LECs, or to use other available alternative routes –

---

[18] *Id.* ¶ 17.

[19] *Id.* ¶ 25.

[20] *Id.* ¶ 25-27.

both of which result in continued payments to the access stimulating LECs in violation of the FCC's rules.[21]

### C. The FCC's Access Stimulating Rules Prohibit LTE's Conduct.

41.    Under the FCC's rules, a CLEC engages in "access stimulation" if it meets one of multiple traffic-based triggers. First, the rules have long deemed a competitive LEC to be an access stimulator if it has (i) a "revenue sharing agreement" and either (ii)(a) an "interstate terminating-to-originating traffic ratio of at least 3:1 in a calendar month" or (ii)(b) "has had more than a 100 percent growth in interstate originating and/or terminating switched access minutes of use in a month compared to the same month in the preceding year."[22] Second, in 2019, the FCC adopted a new rule treating a competitive LEC as an access stimulator even if it lacks a revenue sharing agreement, where it "has an interstate terminating-to-originating traffic ratio of at least 6:1 in an end office in a calendar month."[23]

42.    In determining whether a terminating LEC has exceeded these thresholds, "all traffic should be counted regardless of how it is routed . . . originating traffic using tariffed access services counts as does originating traffic using a 'least cost router under negotiated billing arrangements outside of the access regime.'"[24]

43.    Under the FCC's Access Stimulation rules, an access-stimulating LEC, here LTE, is "require[d]… to designate in the Local Exchange Routing Guide (LERG) or by contract the

---

[21]Free Conferencing Reply in Support of Emergency Pet. for Waiver at 5, *Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage*, WC Docket No. 18-155 (Jan. 17, 2020).

[22] 47 C.F.R. § 61.3(bbb)(1)(i).

[23] Id. § 61.3(bbb)(1)(ii).

[24]*Access Arbitrage Order* ¶ 52.

route through which an IXC can reach the LEC's end office or functional equivalent and to bear financial responsibility for all interstate and intrastate tandem switching and transport charges for terminating traffic to its own end office(s) or functional equivalent whether terminated directly or indirectly.[25] Once an LEC is an access stimulator, it is "responsible for the cost of call delivery to itself because *it* chooses the call path."[26]

44.     The FCC's access stimulation rules apply even where the call is voice-over-IP and the call is routed using Internet protocols.[27]

**D.  LTE's Access Stimulating Scheme**

45.     In approximately December 2019, Shavkat Ilya contacted Peerless. Mr. Ilya has been described at various times as the Chief Executive Officer, President, Regulatory Manager, and Secretary of LTE. Mr. Ilya inquired about whether Peerless could provide access homing tandem to LTE, which would allow other carriers to route telephone calls to LTE telephone numbers.

46.     Mr. Ilya represented to Peerless that LTE was currently using LCR Hub as its homing tandem service provider, and was looking for Peerless to provide intermediate tandem services under a commercial agreement to terminate calls to its end user customers in South Dakota, North Dakota, Oregon and New York. In fact, Peerless later learned that LCR Hub was not accepting telephone calls through LCR Hub's tandem switch for calls destined to LTE.

47.     Mr. Ilya further stated that LTE would have approximately 30,000,000 minutes of use ("MOU") per month at the start, and would ramp up to over 60,000,000 MOUs per month from new customers such as retailer outlet Michael Kors and Microsoft. Mr. Ilya further

---

[25] *Access Arbitrage Order* ¶ 17; 47 C.F.R. § 61.26.

[26] *Wide Voice Order* at 9774 (emphasis added) (citing 47 CFR § 51.914(a)).

[27] *Id.* at 9785.

represented that these calls were primarily calls terminating to LTE's alleged customers' call centers.

48.     Mr. Ilya further represented that LTE was not an access stimulator, and that the traffic that would be generated by would not be access stimulating traffic.

49.     Mr. Ilya further represented that the calls would be terminating to customers in various states (*e.g.* Oregon, Iowa, etc.) associated with the following NPA-NXX number blocks assigned by NANPA, the North American Number Plan Administrator to LTE:   458-238 (Oregon), 701-50 (North Dakota), 701-717 (North Dakota), 712-598 (Iowa), 712-361 (Iowa), 917-571 (New York), 838-210 (New York). Mr. Ilya further stated that all of this traffic would be "homed" to LTE's end office switch in South Dakota designated in the LERG as MCHLSD01DS0.

50.     On or about March 19, 2020, Peerless and LTE entered into an agreement ("Direct Connected Termination Services Agreement" or "Agreement") which provided that Peerless would route telephone calls to LTE authorized telephone numbers that had been assigned to LTE's end user customers.

51.     The Agreement provided that Peerless would act as an intermediate tandem provider for other carriers on calls destined to LTE telephone numbers assigned to LTE customers. In this arrangement, Peerless would charge third-party carriers—*e.g.* LECs and IXCs—for calls that they needed to terminate to LTE telephone numbers. Peerless would then pay LTE at the rates set forth in Appendix A to the Agreement.

52.     Peerless and LTE Wireless established their direct connection in the Spring 2020 with a limited capacity for traffic.

53.     Traffic between March 27, 2020 and May 31, 2020 was approximately 223,000 MOUs. In June 2020, traffic increased to approximately 716,000 MOUs. In July 2020, traffic increased to over 1,979,000 MOUs. In August 2020, traffic increased to over 6,000,000 MOUs.

54.     In August 2020, Mr. Ilya began to complain to Peerless and other carriers that capacity constraints between Peerless and LTE were causing network congestion and blocked calls. LTE threatened that if Peerless did not increase the capacity between Peerless and LTE, it would file a complaint to the FCC to allege that Peerless was violating the FCC's Rural Call Completion requirements.[28]

55.     Relying on Mr. Ilya's representations, threats and complaints, beginning in September, Peerless devoted significant additional switch and transport capacity to address what Mr. Ilya claimed were rural call-completion issues.

56.     In October 2020, after Peerless increased switch and transport capacity, Peerless recognized a material spike in the volume of calls that were being delivered from various carriers and destined to LTE. For instance, for calls made in September 2020, traffic increased to over 40,000,000 MOUs—a greater than 600% increase from calls made in August 2020. This increase in traffic continued on to October 2020 with greater than 124,000,000 MOUs—a 2000% increase from August 2020.

57.     During this entire period of time, there were no—zero—minutes of use originated by LTE end user customers that were destined to Peerless.

58.     Upon information and belief, there was at least one other carrier, Impact Telecom, that also terminated telephone calls from other carriers to LTE in 2020. The minutes of use

---

[28] 1.  *See generally* 47 C.F.R. § 64.2101 et seq.

associated with Impact Telecom would also be relevant in determining whether LTE is an access stimulator but Peerless does not have that information.

59.     Without Peerless taking action to increase its switch and transport capacity with LTE, Peerless would not have been able to accommodate the dramatic increase in call volume that started in September 2020—a call volume that dramatically exceeded the initial estimates of 60,000,000 MOUs per month. On information and belief, Mr. Ilya and LTE manufactured the issue of network congestion and failed calls to provide the pretext for Peerless to expand capacity.

60.     When Peerless asked Mr. Ilya to explain the significant increase in traffic volumes, Mr. Ilya stated that LTE had a very large customer that has a Spanish business. Mr. Ilya stated that this business had their own on-premises equipment that had been failing and causing issues. Mr. Ilya assured Peerless that LTE had deployed their own team of personnel to remove that equipment and add their own equipment, and that this would fix the problem.

61.     In fact, calls to LTE customers' telephone numbers would terminate to a recorded voice that would continuously "loop" and replay. There are different recordings. For example, in one set of recordings a voice actor, who calls himself "Carlo", "John" or both depending upon the loop, identifies himself as Carlo and acts as if he can't hear the caller. In a second recording, the voice actor first identifies himself as John, then a new loop starts and he's identified as Carlo. Another recording is a looping recording of a purported operator for the "Educational Institute."

62.     In January 2021, Peerless was informed by other carriers that the United States Telecom Association ("USTA") was in the process of conducting a review of LTE and investigating complaints against LTE by other carriers.

63.     Through a Freedom of Information Act request, Peerless confirmed that the USTA submitted a report to the FCC. This report described LTE's unlawful access stimulation scheme as follows:

**HOW IT WORKS**
Several steps are involved in the chain that propagates the fraud.

1)     A hacker anywhere in the world signs up with Kappa Premium Telecom, based in India, and is assigned one or more USA telephone numbers.  Providers have evidence of such hackers being based in Pakistan, Palestine, and elsewhere.

2)     The hacker pushes call traffic to those number(s). This is usually done by hacking into USA-based private switches (i.e., PBXs) over the internet and causing the PBX (via call-forwarding or Direct Inward Station Access) to place calls to those numbers.

3)     The service provider serving the PBX owner completes each call by first looking up the destination number, which reveals its assignment to LTE Wireless. Most service providers are not directly connected to LTE Wireless, so they send the call to a downstream provider to complete the call, incurring a per-minute fee.

4)     The downstream provider may also not have a direct connection to LTE Wireless, so it sends the call to yet another downstream provider (paying a fee slightly lower than what they charge their upstream provider customer). This process may repeat until the call is terminated with LTE Wireless.

5)     Eventually, a provider with a direct connection to LTE Wireless hands the call to them, in this case paying LTE Wireless a per-minute fee.

6)     At regular intervals, LTE Wireless tallies the minutes of traffic and, presumably, shares a fraction of the revenue received to Kappa Premium Telecom.

7)     Kappa Premium, per their Facebook and web documents, pays a fraction of its share of revenues to the hacker(s) from step 1.

8)     Some intermediate providers, that have restricted traffic to LTE Wireless, have received from LTE Wireless offers of direct connection and threats of complaints to regulators if calls are not completed.  As a result, there may be limited, if any, intermediate providers that are registered per the FCC's rural call completion rules available to complete an LTE Wireless call

(USTA Industry Traceback Group LTE Wireless, Inc. Suspicious Provider Brief – Jan. 2021, attached hereto as Exhibit A ("USTelecom Report").

64.     According to the USTelecom Report, LTE worked with other carriers and third parties, including Mr. Ilya, Kappa Premium, LCR Hub and Telxmedia, to coordinate this access stimulation scheme. The USTelecom Report contends that "Telxmedia and LCR Hub appear to be cooperating with and facilitating LTE Wireless's scheme."  Ex. A at 6.

65.     Approximately 80% of the calls destined to LTE were to telephone number blocks that NANPA originally assigned to LTE. Telephone number porting records from NANPA show that the remaining 20% of the telephone numbers associated with the access stimulation scheme were assigned originally to TelxMedia, Inc., and ported to LTE in approximately December 2019. Mr. Faizal Hassad, an officer of TelxMedia, paid the Iowa Secretary of State the fees to permit LTE to operate in Iowa as a foreign corporation in June 2019.

66.     While LCR Hub is listed as the default homing tandem for LTE in the LERG, calls were not completed using LCR Hub, and as a result, an excessive number of calls were instead routed through Peerless.

67.     According to the USTelecom Report, Kappa Premium advertised that it would pay other providers that generated call traffic to LTE telephone numbers with revenue from LTE. Ex. A at 4 – 5.

**E.  LTE is an Access Stimulator in Violation of the Act and FCC's Rules.**

68.     Under the FCC's rules, LTE was an access stimulator for all traffic exchanged with Peerless. Upon information and belief, LTE had a revenue sharing agreement with its customers, the originating to terminating ratio of LTE's traffic exceeded 3:1 and 6:1, and LTE's traffic volume grew by more than 100% in 2020, when compared to 2019.

69.     LTE is required by the FCC's rules to pay Peerless for all costs associated with the tandem switching and transport charges for terminating traffic to LTE's telephone numbers.

70.     LTE's conduct resulted in Peerless billing numerous originating carriers for the switching and transport services required to deliver the calls to LTE. Carriers who have paid Peerless for those services have demanded a refund, and clawed back payments made to Peerless for the LTE traffic.

**COUNT ONE**
**Unjust and Unreasonable Practice: Violation of Access Arbitrage Rules -**
**LTE Is an Access-Stimulating LEC, But It Has Unlawfully Billed**
**Termination Charges to Peerless and Has Failed To Accept Financial**
**Responsibility for the Charges of Intermediate Access Providers**
**47 U.S.C. §§ 201, 251, 254, 256**

71.     Peerless repeats, re-alleges, and incorporates by reference Paragraphs 1 through 70 of its Complaint as if fully set forth herein.

72.     Section 201(b) of the Act prohibits LTE from engaging in any practices that are unjust and unreasonable.[29]

73.     In its *Access Arbitrage Order*, the FCC issued rules, pursuant to §§ 201(b), 251(a)(1), 251(b)(5), 254, and 256 of the Act, that sought to eliminate access arbitrage schemes, including implicit subsidies, by making access-stimulating LECs financially responsible for the transport and termination of traffic. The FCC's rules validly implement these sections of the Act, and thus a violation of the rules constitutes a violation of these sections of the Act.

74.     Under the rules, when a LEC meets specified triggers, it is engaged in access stimulation.[30] Once a LEC is engaged in access stimulation, then it (1) may not directly bill tandem switching and transport charges to long distance carriers and (2) must notify the FCC,

---

[29] 47 U.S.C. § 201(b).

[30] *Access Arbitrage Order* ¶¶ 89-105.

and relevant long distance carriers and intermediate access providers, that it is financially responsible for the intermediate access providers' terminating tandem switching and transport charges.[31]

75. LTE meets the triggers that determine when a competitive LEC is engaged in access stimulation. In each month that Peerless has terminated call to LTE, the ratio of terminating-to-originating traffic exceeded the 6:1 ratio set forth in the FCC's rules at each LTE end office. LTE's ratio of terminating-to-originating traffic also exceeded 3:1 and meets the "growth" trigger in the FCC's rules, and either has a revenue sharing agreement with Kappa Premium or other providers, or is presumed to have a revenue sharing agreement.[32]

76. Even though LTE is engaged in access stimulation, LTE billed Peerless terminating charges under the Agreement. LTE's billing of these charges violates the FCC's rules and the sections of the Act that the rules implement, and is an unreasonable practice under § 201(b) of the Act.

77. Further, even though LTE is engaged in access stimulation, LTE failed to notify Peerless that it is engaged in access stimulation and is financially responsible for the intermediate access providers' terminating tandem and transport charges.

78. As a direct and proximate result of LTE's violations of the Act, Peerless has been unjustly and unreasonably billed by LTE for terminating charges, and has incurred tandem switching and transport costs in routing calls to LTE.

---

[31] 47 C.F.R. § 61.3(bbb).

[32] *Transformation Order* ¶ 699 (for pleading purposes, satisfaction of the 3:1 traffic ratio test or the growth test "create[s] a rebuttable presumption that revenue sharing is occurring and the LEC has violated the Commission's rules.")

79.     As a direct and proximate result of LTE's conduct in violation of Section 201(b) of the Act, associated FCC rules and precedents, its billing Peerless for terminating charges, and attempt to avoid paying costs mandated by law, the FCC's rules and FCC's decisions, Peerless has suffered damages and loss it is entitled to recover in an amount to be determined at trial, along with interest and reasonable costs and attorneys' fees pursuant to 47 U.S.C. § 206.

80.     LTE is liable to Peerless for its violations of the Act and the FCC's rules, and is liable to Peerless for its costs incurred and other damages as a result of these violations.

**COUNT TWO**
**47 U.S.C. § 201**
**Unjust and Unreasonable Practice: LTE's Practices Related to the Access Stimulation Traffic It Routes Are Unreasonable**

81.     Peerless repeats, re-alleges, and incorporates by reference Paragraphs 1 through 80 of its Complaint as if fully set forth herein.

82.     Section 201(b) prohibits LTE from engaging in any practices that are unjust and unreasonable.[33]

83.     Even assuming, *arguendo*, that LTE is not engaged in access stimulation pursuant to the FCC's rules, LTE's conduct and actions are unjust and unreasonable practices undertaken to circumvent the FCC's rules.

84.     LTE has billed terminating charges to Peerless and possibly other carriers, which are then used as an implicit subsidy for free or low-cost calling services offered by its partners.

85.     LTE, along with its partners, also created an unreasonable sham arrangement to evade the FCC's rules and to inflate terminating charges billed to Peerless and possibly other carriers. Such sham arrangements are an unreasonable practice under § 201(b), and it is improper

---

[33] 47 U.S.C. § 201(b).

to use a "bona fide" entity to "facilitate an arrangement among several entities to capture access revenues that could not otherwise be obtained by lawful tariffs."[34] LTE is engaging in precisely this misconduct.

86.     As a direct and proximate result of LTE's violations of the Act, Peerless has been unjustly and unreasonably billed by LTE for terminating charges, and has incurred tandem switching and transport costs in routing calls to LTE.

87.     As a direct and proximate result of LTE's conduct in violation of Section 201(b) of the Act, associated FCC rules and precedents, its billing Peerless for terminating charges, and attempt to avoid paying costs mandated by law, the FCC's rules and FCC's decisions, Peerless has suffered damages and loss and is entitled to recover its damages in an amount to be determined at trial, along with interest and reasonable costs and attorneys' fees pursuant to 47 U.S.C. § 206.

88.     LTE is liable to Peerless for its violations of the Act and the FCC's rules, and is liable to Peerless for its costs incurred and other damages as a result of these violations.

**WHEREFORE**, Peerless Network, Inc. respectfully requests that the Court enter judgement in its favor against LTE Wireless, Inc. and award the following relief:

a.     declare that LTE is and was an access stimulating LEC at all times relevant;

---

[34] Declaratory Ruling, *AT&T and Sprint Petitions for Declaratory Ruling on CLEC Access Charge Issues*, 16 FCC Rcd 19158, ¶ 22 n.33 (2001) ("*AT&T/Sprint Declaratory Ruling*"), overruled on other grounds, *AT&T Corp. v. FCC*, 292 F.3d 808 (D.C. Cir. 2002); *see also Call Blocking Declaratory Ruling and Order*, 22 FCC Rcd 11629, at 11631 (¶ 6 n.20) (the FCC has "found that an arrangement between a chat line service provider and competitive access provider (formed by an ILEC for purposes of the arrangement) that did not provide local exchange service and had no customers other than the chat line was a sham"); Memorandum Opinion and Order, *Total Telecomms. Servs., Inc. v. AT&T Corp.*, 16 FCC Rcd 5726, ¶¶ 15-18 (2001); *AT&T Corp. v. FCC*, 317 F.3d 227, 232s (D.C. Cir. 2003) ("the entire arrangement was devised solely in order to circumvent regulation . . . [and] deserves to be treated as a sham").

b. declare that LTE's actions are unjust and unreasonable in violation of Section 201(b) of the Act;

c. award Peerless its damages, in an amount to be determined at trial, plus late payment fees, interest and costs incurred as a result of the actions and conduct of LTE;

d. issue appropriate injunctive relief to enjoin LTE's unjust and unreasonable practices;

e. award Peerless its attorneys' fees and costs; and,

f. award such other relief as the Court deems just.

## JURY DEMAND

Peerless demands a trial by jury of all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated: New York, New York
   January 21, 2022

Respectfully submitted,

KELLEY DRYE & WARREN LLP

/s/ Philip D. Robben
Philip D. Robben (PR 4135)
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Telephone: (212) 808-7726
Facsimile: (212) 808-7897
probben@kelleydrye.com

*Attorney for Peerless Network, Inc.*

Henry T. Kelly
Catherine E. James
Mark J. Scott
KELLEY DRYE & WARREN LLP
333 West Wacker Drive, Suite 2600
Chicago, Illinois 60606
Telephone: (312) 857-2350
Facsimile: (312) 857-7095

hkelly@kelleydrye.com
cjames@kelleydrye.com
mascott@kelleydrye.com

*Attorneys for Peerless Network, Inc.*

.

.